AMERICAN CAN COMPANY *v.* Lila D. PETTYJOHN, Widow of John R. Pettyjohn

75-20                                          522 S.W. 2d 358

Opinion delivered May 12, 1975

*Bethell, Callaway & Robertson,* for appellant.

*Jones, Gilbreath & Jones,* for appellee.

LYLE BROWN, Justice. This is a workmen's compensation death claim which grew out of a heart attack to John R. Pettyjohn, claimant's husband. The commission allowed the claim and the circuit court affirmed. Appellant contends that the award is not supported by sufficient, competent, corroborative evidence. The basis of the point for reversal is that claimant did not meet her burden of corroborating declarations of the deceased employee. Ark. Stat. Ann. § 81-1327 (a) (Repl. 1960) reads in part: "Declarations of a deceased employee concerning the injury in respect of which the investigation or inquiry is being made, or the hearing conducted, may be received in evidence, and may, if corroborated by other evidence, be sufficient to establish the injury". We find there was sufficient corroboration and we affirm the circuit court.

Employees of appellant testified as to the work activities of Pettyjohn on his last trip as the operator of a tractor-trailer rig. On May 1, and 2, 1972, he drove a large tractor-trailer rig from Fort Smith, Arkansas to St. Louis, Missouri. There he assisted in the unloading of 13,367 pounds at his first destination, and then unloaded 6,968 pounds represented by 447 cartons at his second destination. He drove 829 miles on this last trip. He drove back to Fort Smith on May 2, and parked his truck at approximately 10:30 p.m. He entered the hospital on May 3, 1972, at approximately 5:00 a.m. suffering severe chest and arm pains. He died on May 6.

A fellow employee made the same trip in another truck and helped in the first unloading. That employee said Pettyjohn became ill while the unloading was being performed .

and suspended work for five to eight minutes. Then at a truck stop on the way back, Pettyjohn emerged from a rest room and told his co-worker he had diarrhea. Pettyjohn related to his wife and doctor that he experienced severe pain in the arms and chest on his trip to and from St. Louis and stated that the pain was such that he thought he would not make it back to Fort Smith.

Appellant's traffic manager testified that during the last three weeks of Pettyjohn's employment he unloaded 49,707 pounds of merchandise and drove the tractor-trailer about 2,500 miles.

Dr. McMinimy testified that the extent of exertion attributed to Pettyjohn "definitely aggravated his heart condition". "The unloading of the material would aggravate or precipitate the myocardial infarction. *** "The classic description of angina pectoris is exertional pain; pain comes on with exertion. This man was exerting himself driving that truck. He undoubtedly, in driving the truck from Fort Smith to St. Louis and from St. Louis back to Fort Smith, probably had a certain amount of tension and so on, and if he was having pretty severe chest pain, where he wasn't sure he was going to get home, he probably was pretty anxious and pretty frightened. Which, I'm sure, also had its bad effect on his angina pectoris. There is no question that this amount of exertion aggravated the man's heart problem. *** My opinion is that his work definitely aggravated his heart condition." Dr. McMinimy had within his knowledge, not gained by hearsay from the patient, the pressurizing labors exerted by Pettyjohn, a man with a medical record of heart condition. It was his medical opinion that the strain of the labor brought on the fatal attack. We think it cannot be argued with rationality that the cause of death was established solely by the statements of Pettyjohn.

Affirmed.

HARRIS, C.J., and FOGLEMAN and JONES, JJ., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. There is only one rule of evidence which the Workmen's Compensation Act [Ark. Stat. Ann. § 81-1301 — 1349 (Repl. 1960, Supp. 1973)] imposes upon the Workmen's Compensation Commission. It is that involved here. It might be called an offshoot of the dead man's statute.

There is no indication in the statute that a declaration may, by "bootstrapping," be its own corroboration. But that is the effect of the court's decision in this case.

There is no room for doubt about what the commission found to be the compensable injury in this case. It was a fatal heart attack caused, aggravated or contributed to by Pettyjohn's employment with American Can Company, in that the stress, strain and physical exertion of his employment aggravated his preexisting heart condition. This finding was based upon statements allegedly made by Pettyjohn. This conclusion seems inescapable to me. The commission said:

> . . . The crucial issue, upon which compensation depends, is a typical issue in cardiac cases. It is, of course, the issue of causation. While this seems to be entirely a question of fact and of degree, it must be determined within the legal framework of "a preponderance of evidence" including within it the concept of "reasonable medical certainty."

> . . . By history, Mr. Pettyjohn had symptoms of cardiac involvement, probably ischemic-myocardial necrosis, as early as April 29, two days prior to his departure on his last run. Respondents suggest this fact leads to a conclusion of no causation.

> The Commission is persuaded that Mr. Pettyjohn did in fact have severe chest pains while driving on his return trip from St. Louis on May 2. The only evidence on the point other than the decedent's history as given to his treating physician is the testimony of Mr. Herbert Pat Robertson. Mr. Robertson attributed the complaints which Mr. Pettyjohn made of being afraid he would not make it home, to an episode of diarrhea

which Mr. Pettyjohn apparently had. While Mr. Pettyjohn had no compelling need to explain to Mr. Robertson his fear, the need to be honest and straightforward with his treating physicians in the history given is obvious. As indicated by the Referee in his letter of January 11, 1974, the "hearsay" statement by the decedent to Dr. Stewart and Dr. Klopfanstein is admissible because it was made by a patient to his physician while seeking diagnosis and treatment. Dr. McMinimy, as associate of Dr. Klopfenstein, of necessity relied upon this "history" in his treatment of the decedent and there is no logical reason he should not be allowed to rely upon it in giving his opinion of causation. Thus, the medical opinions differing and both being given within a reasonable degree of medical certainty, the Commission, considering the sequence of events, the time element, and giving the benefit of reasonable doubts to the claimant, accepts the opinion of Dr. McMinimy with reference to the issue of causation.

With reference to the need for corroboration as suggested by respondents, the Commission is of the opinion the decedent made no declarations "concerning the injury" within the meaning of Section 27 (a) requiring corroboration. In any event, the Commission believes there is sufficient other evidence, albeit circumstantial, to support this finding of causation.

Of course, the majority does not support (I do not see how it could) the Commission's holding that somehow the fact that Pettyjohn's statements were made to a treating physician made the statute inapplicable. But this is the basis upon which the Commission found it admissible. And there is no escaping the fact that the severe chest pains were the foundation of the finding upon which the award was made in this case, as the opinion clearly shows.

It could not have been otherwise. Three physicians testified. All were associates in the Holt-Krock Clinic. Dr. John Ben Stewart did not feel qualified to express any opinion about the relationship between Pettyjohn's operation of the company truck and his myocardial infarction. Dr. Keith

Klopfenstein expressed the opinion that there was no connection. Inevitably and understandably the award depends entirely upon the opinion expressed by Dr. McMinimy. Take away the claimant's statement and the opinion falls completely and is totally without probative value

Dr. McMinimy first saw Pettyjohn on May 5, 1972. He was seeing the patient in conjunction with Dr. Klopfenstein. The medical history taken by Drs. Stewart and Klopfenstein reflected that Pettyjohn stated that on April 29 he had started having severe chest pains, which lasted about 1 ½ to 2 hours, and on May 2, while driving to St. Louis, he had several attacks of chest pain which became so severe while driving back to Ft. Smith from St. Louis that he thought he would not make it back. Pettyjohn had related to Dr. Klopfenstein a history of exertional chest pain dating back several years, compatible with angina pectoris, and, over the preceding four or five days, numerous severe episodes of chest pain at rest, a couple of which were associated with cold sweat. No one else ever said that Pettyjohn had suffered chest pains. Nobody ever said that the sickness of which he complained to Robinson while unloading in St. Louis, or his illness in Lebanon, or his insomnia at Sullivan consisted of, in whole or in part, chest pains. Mrs. Pettyjohn did not mention chest pains, except to say that after his return from St. Louis, her husband had told her that he had suffered chest pains. Surely no one is contending that a repetition of a declaration is corroborative of it.

When Dr. McMinimy was asked to point out anything in the death summary written by Dr. John Ben Stewart that would indicate that the claimant's work aggravated or precipitated his heart attack, he responded:

> . . . According to this record, this man started having pain on April 29. On the night of April 29, he had chest pain radiating into his left arm, profuse diaphoresis or profuse sweating that lasted about an hour and a half to two hours.

> . . . On Monday, May — the 29th would be what? It would be Saturday, wouldn't it? May 1, which would

have been two days after the onset of this chest pain, he drove his truck to St. Louis, and then he drove the truck back the following night and had several attacks of substernal angina type pain, and was then brought to the emergency room.

When the referee asked Dr. McMinimy what facts he was relying on in expressing his opinion, the doctor's answer, insofar as material, was:

Well, the fact that the man drove the truck — he had the pain on April 29, he obviously had angina. He drove the truck on May 1 and May 2 and had his severe chest pain, and apparently had severe chest pains while he was driving his truck home, almost to the point that in his history he states that he didn't think he was going to make it home. Then the next morning early he had severe chest pain which brings him to the hospital, and at that time had probably started the process of myocardial infarction. Now, in my opinion, the fact that the man had pain while he was driving the truck, that he had angina occurring on the 29th, meaning that he was already having pretty severe chest problems, that those arteries were already narrowed and were not carrying an adequate amount of blood to the heart. The heart was having to work — driving that truck you know. Imagine a big truck — driving it from Fort Smith to St. Louis and from St. Louis back to Fort Smith. His heart was beating faster and there were more demands on the heart for blood, because it had to pump more blood to keep blood going to his brain, to his muscles and so on — all of the obvious things that the heart does. He was putting excess strain on that heart and on those blood vessels to do this amount of work. And in my opinion, that definitely is not very conducive to treating a heart problem . . . There is no question about the fact that anxiety, tension, pressures aggravate the heart. . . So there was no question or has been no question since that time that tension, anxiety and so on, aggravate chest-pain. The classic description of angina pectoris is exertional pain; pain comes on with exertion. This man was exerting himself driving that truck. He undoubtedly, in

driving the truck from Fort Smith to St. Louis and from St. Louis back to Fort Smith, probably had a certain amount of tension and so on, and you can imagine — if he was having pretty severe chest pain, where he wasn't sure he was going to get home, he probably was pretty anxious and pretty frightened. Which, I'm sure, also had its bad effect on his angina pectoris. So, in my opinion, there is just no question — in all of the experience I've had in taking care of heart patients all these years, there is no question that this amount of exertion aggravated this man's heart problem. If this man, on April 29, had stayed home, gone to bed and seen Dr. Ben Stewart at that time, taken his medicine, gotten in the hospital, he might have been alive today. But he didn't do that, but he did things that were very foolish for a patient with severe heart problems. And that, probably, is a causative factor, I think, or one of the factors that probably put this man in his grave. It's just that simple . . . after his pain started on April 29, he just added fuel to the fire.

Upon cross-examination, the following was included:

A. . . . [T]his is a classic story of most patients with angina — that if they have angina pectoris and they engage in activity but stop and rest their pain goes away, we assume that most of these people, at least for a long period of time, do not go ahead and develop a coronary occlusion.

Q. Do we not have some reason to believe that that is what happened to Mr. Pettyjohn over an extended period of time?

A. No. I don't really think we could say that, because this man had chest pain — pretty severe pain — back on April 29 . . . . I don't know what happened to him on April 29 to cause him to start having chest pain, but he apparently had something happen to cause him to have pretty severe chest pain with profuse diaphoresis. And incidentally, most patients with angina pectoris will not have profuse diaphoresis, they have just the chest pain

and they stop and rest and so on. So we can kind of assume that this man was having some pretty bad changes occur to his arteries on April 29. That's not definite, but it's possible. Now, the fact that he started having pain at that time, and that he did all of the exertion, he perhaps could have aggravated his artery condition by making more demands — making more blood try to go through this artery, and maybe doing more damage to that ulcerating plaque, if this is the case, and eventually causing it to be irritated enough that it completely occluded the artery, or the thrombosis occurred at that point. I can't tell you, and I don't think that anybody can actually tell you what happened to this man.

\*\*\*\*\*

A. . . . I would agree that he had the disease prior to the time he drove the truck, but there would be no question in my mind that driving the truck with that amount of exertion, and having that amount of pain while he was driving the truck, aggravated his heart condition. It put his heart under more strain, more stress. He could have even had some arrhythemia during that time. It's possible that while he had that pain and was driving the truck — he could have had ventricular tachycardia. He expressed the feeling that he thought he wasn't going to make it. He could have had an episode of ventricular tachycardia, a drop in blood pressure and a number of things that may have actually precipated his actual occlusion at that point, you see.

\*\*\*\*\*

Q. Now, Dr. McMinimy, aren't you essentially engaging in speculation as to how severe the April 29 angina pectoris attack was?

A. Oh, yes. I'm basing my opinion, since I didn't see the man, and I didn't know how much his pain was — I'm basing my opinion on what history these men have. And as a matter of fact, they were basing their opinion

on what the man told them.

Q. So it would be true that to the extent that you have purported to state any relationship at all between the man's employment and his death, you are relying entirely on a chart entry made by other physicians, with respect to the history given them by the patient?

A. Right.

\*\*\*\*\*

A. It's very possible that this man could have had — back on the 29th — that he could have had a bad attack and had his coronary occlusion and have died April 29 before he ever drove his truck, but he didn't have that bad an attack that night. He did drive his truck and he had pretty severe pain, according to the history, enough so that he said he didn't think that he was going to make it while he was driving his truck. So on the basis of the history I would assume that the man had definite pain and had definite aggravation of his problem by driving his truck.

\*\*\*\*\*

Q. Now, let's return to the concept of anginal pain. You are assuming that he had an episode of anginal pain or angina pectoris while driving his truck; is that correct?

A. Yes.

\*\*\*\*\*

A. . . . [I]t's possible that he could have gotten home, felt fine, got over his attack, next day on May 3 felt fine and gone back to work. But in his case he didn't feel fine, he had pain — bad pain on May 3. And I think driving that truck from Fort Smith to St. Louis and from St. Louis back, and having that bad pain when he thought he wasn't going to make it — I think this definitely aggravated his heart condition.

\*\*\*\*\*

A. . . . And I think it's possible, and very probable, that this man — with his coronary artery disease, his preinfarction angina, arteries that were just pretty darned narrow and not carrying enough blood with the amount of exertion that he had, and having this pretty bad pain, where he felt he wasn't going to make it, just overtaxed his heart. Particularly if he had episodes of ventricular tachycardia, he may have stretched his heart muscles to produce some degree of mild heart failure.

\*\*\*\*\*

Q. Now, you would not have been able to express any opinions such as you have just expressed, without relying on the hospital chart entries regarding the history; is that true?

A. Oh, yes.

Q. In other words, if you had just seen the man after he was already in the acute state, you could not have expressed any of the opinions that you have just stated?

A. Well, without some history, yes; I would have to know some history.

Q. And you are necessarily relying on history that was taken by another physician?

A. Right.

\*\*\*\*\*

Q. . . . you are relying entirely on the history that was in the hospital chart; is that correct?

A. Yes, sir, I stated that.

\*\*\*\*\*

MR. GILBREATH: . . . he is fixing to go to England for a year and a half, and I will not have an opportunity to retake his deposition. So if there is any sustaining to this objection I want to know it right now, so as to shore up his testimony, to have the matter covered several different ways.

THE REFEREE: I fail to see how you can "shore up" his testimony on the fact that he is relying upon history.

And finally when asked to state his opinion as to whether or not the driving of the truck and Pettyjohn's unloading it could have "aggravated or precipitated his myocardial infarction," the doctor was asked to assume, among other things, that the hypothetical individual, during a May 1 to May 3 trip from Fort Smith to St. Louis experienced severe chest pain.

I simply say that Dr. McMinimy had no opinion which was not based on Pettyjohn's uncorroborated declarations and he certainly stated none. I would reverse the judgment.

I am authorized to state that the Chief Justice and Mr. Justice Jones join in this opinion.